FILED

2018 JUN -5 PM 1: 19

CLERK U.S. DISTRICT COURT
CENTRAL DIST. OF CALIF.
LOS ANGELES

BY_____

UNITED STATES DISTRICT COURT

FOR THE CENTRAL DISTRICT OF CALIFORNIA

February 2018 Grand Jury

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>                    Plaintiff,<br><br>                    v.<br><br>ALEKSANDR SURIS and<br>MAXIM SVERDLOV,<br><br>                    Defendants. | No. CR 17-420(A)-SJO<br><br>F I R S T<br>S U P E R S E D I N G<br>I N D I C T M E N T<br><br>[18 U.S.C. § 1349: Conspiracy<br>to Commit Health Care Fraud;<br>18 U.S.C. § 1347: Health Care<br>Fraud; 18 U.S.C. § 1956(h):<br>Conspiracy to Commit Money<br>Laundering; 18 U.S.C. § 2(b):<br>Causing an Act to be Done;<br>18 U.S.C. §§ 981(a)(1)(C),<br>982(a)(1), 982(a)(7), and<br>28 U.S.C. § 2461(c):<br>Criminal Forfeiture] |

The Grand Jury charges:

COUNT ONE

[18 U.S.C. § 1349]

[Conspiracy to Commit Health Care Fraud]

A.   INTRODUCTORY ALLEGATIONS

At all times relevant to this First Superseding Indictment:

1.   Royal Care Pharmacy ("Royal Care") was a pharmacy located at 7300 W. Sunset Blvd., Suite L, Los Angeles, California, within the Central District of California.

1        2.    Defendant ALEKSANDR SURIS ("SURIS") was a co-owner and
2    co-operator of Royal Care.

3        3.    Defendant MAXIM SVERDLOV ("SVERDLOV") was a co-owner,
4    co-operator, and Chief Financial Officer of Royal Care.

5        4.    Co-conspirator 3 ("CC-3") was a pharmacist licensed by
6    the State of California.  CC-3 was employed by Royal Care as the
7    Pharmacist-in-Charge from at least in or around March 2013,
8    through at least in or around July 2016.

9        5.    A bank account for Royal Care Pharmacy ending in
10   numbers 7230 was opened at JPMorgan Chase Bank, N.A., in or
11   around June 2006 ("RCP CHASE 7230").  Defendants SURIS and
12   SVERDLOV were signatories on this bank account.

13       6.    Co-conspirator 4 ("CC-4") was an individual who owned
14   and controlled TriMed Medical Wholesalers, Inc. ("TriMed"), a
15   California corporation and drug wholesale business operating
16   within the Central District of California.  CC-4 controlled and
17   was a signatory on multiple TriMed business bank accounts with
18   branch locations within the Central District of California
19   including, but not limited to, a City National Bank account
20   ending in numbers 1925 ("TRIMED CNB 1925").

21   B.    THE MEDICARE HEALTH INSURANCE PROGRAM

22       7.    Medicare was a federal health care benefit program,
23   affecting commerce, that provided benefits to individuals who
24   were 65 years and older or disabled.  Medicare was administered
25   by the Centers for Medicare and Medicaid Services ("CMS"), a
26   federal agency under the United States Department of Health and
27   Human Services.

28   //

8.   Individuals who qualified for Medicare benefits were referred to as Medicare "beneficiaries." Each beneficiary was given a unique health insurance claim number ("HICN").

9.   Medicare programs covering different types of benefits were separated into different program "parts." Part D of Medicare (the "Medicare Part D Program") subsidized the costs of prescription drugs for Medicare beneficiaries in the United States. The Medicare Part D Program was enacted as part of the Medicare Prescription Drug, Improvement, and Modernization Act of 2003 and went into effect on January 1, 2006. Under the Medicare Part D program, providers such as Royal Care were paid for prescription drugs they dispensed only if: (a) the drugs were actually provided to the Medicare beneficiaries; (b) the drugs were medically necessary; and (c) it was determined that the provider was otherwise entitled to payment.

10.   In order to receive Medicare Part D program benefits, a beneficiary enrolled in a Medicare drug plan. Medicare drug plans were operated by private companies approved by Medicare. Those companies were often referred to as drug plan "sponsors." A beneficiary in a Medicare drug plan could fill a prescription at a pharmacy and use his or her plan to pay for some or all of the prescription.

11.   A pharmacy could participate in the Medicare Part D program by entering into a retail network agreement directly with a plan; with one or more Pharmacy Benefit Managers ("PBMs"); or with a Pharmacy Services Administration Organization ("PSAO"), which would, in turn, contract with PBMs on behalf of the pharmacy. A PBM acted on behalf of one or more

1   drug plans.   Through a plan's PBM, a pharmacy could join the

2   plan's network.   When a Medicare Part D program beneficiary

3   presented a prescription to a pharmacy, the pharmacy submitted a

4   claim either directly to the plan or to a PBM that represented

5   the beneficiary's Medicare drug plan.   The plan or PBM

6   determined whether the pharmacy was entitled to payment for each

7   claim and periodically paid the pharmacy for outstanding claims.

8   The drug plan's sponsor reimbursed the PBM for its payments to

9   the pharmacy.

10       12.   A pharmacy could also submit claims to a Medicare drug

11   plan to whose network the pharmacy did not belong.   Submission

12   of such out-of-network claims was not common and often resulted

13   in smaller payments to the pharmacy by the drug plan sponsor.

14       13.   Medicare, through CMS, compensated Medicare drug plan

15   sponsors.   Medicare paid the sponsors a monthly fee for each

16   Medicare beneficiary of the sponsors' plans.   Such payments were

17   called capitation fees.   The capitation fee was adjusted

18   periodically based on various factors, including the

19   beneficiary's medical conditions.   In addition, in some cases

20   where a sponsor's expenses for a beneficiary's prescription

21   drugs exceeded that beneficiary's capitation fee, Medicare

22   reimbursed the sponsor for a portion of those additional

23   expenses.

24       14.   Medicare and Medicare drug plans (collectively,

25   hereafter, "Medicare") were health care benefit programs, as

26   defined by Title 18, United States Code, Section 24(b).

27   //

28   //

C.   THE OBJECT OF THE CONSPIRACY

15.   Beginning no later than in or around March 2012, and continuing through at least in or around March 2015, in Los Angeles County, within the Central District of California, and elsewhere, defendants SURIS and SVERDLOV, together with co-conspirator CC-3 and others known and unknown to the Grand Jury, knowingly combined, conspired, and agreed to commit health care fraud, in violation of Title 18, United States Code, Section 1347.

D.   THE MANNER AND MEANS OF THE CONSPIRACY

16.   The object of the conspiracy was carried out, and to be carried out, in substance, as follows:

a.   Defendants SURIS and SVERDLOV, as well as CC-3, received information about Medicare Part D program beneficiaries, and certain of their prescription drugs, from various sources including, in some instances, from an operator of another health care facility.

b.   Defendants SURIS and SVERDLOV, together with CC-3 and others known and unknown to the Grand Jury, knowingly and willfully submitted, and caused the submission of, false and fraudulent claims to Medicare on behalf of Royal Care based on false and fraudulent representations, with respect to certain prescriptions, that the prescriptions had been filled, the prescribed medications had been provided to the Medicare beneficiaries, and the prescribed medications were medically necessary.

c.   In truth and in fact, as defendants SURIS and SVERDLOV and CC-3 then knew, these prescriptions had not been

5

1   filled and the prescribed medications had not been provided to

2   the Medicare Part D program beneficiaries, and, on certain

3   occasions, the prescribed medications were not medically

4   necessary.

5          d.   To facilitate the scheme to fraudulently bill

6   Medicare for certain prescription drugs that were never actually

7   filled or provided to beneficiaries, and which were, on certain

8   occasions, not medically necessary, defendants SURIS and

9   SVERDLOV purchased sham/fictitious TriMed invoices (the

10  "fictitious invoices") from CC-4.  The fictitious invoices

11  purported to list various prescription drugs that Royal Care had

12  purchased from drug wholesaler TriMed, and that TriMed had

13  provided to Royal Care.  However, pursuant to an agreement

14  between SURIS, SVERDLOV, and CC-4, CC-4 never actually provided

15  SURIS, SVERDLOV, or Royal Care with the prescription drugs

16  listed on the fictitious invoices, and instead provided SURIS,

17  SVERDLOV, and Royal Care with only the fictitious invoice

18  documents.

19         e.   The fictitious invoices that SURIS and SVERDLOV

20  purchased from CC-4 served multiple purposes, including the

21  following:

22              i.   The fictitious invoices erroneously inflated

23  the volume of prescription drug inventory, at least on paper,

24  that Royal Care ostensibly had available to fill prescription

25  drug orders.  In reality, because Royal Care never actually

26  received the drugs listed on the fictitious invoices, the

27  pharmacy did not have the quantities/types of prescription drugs

28  listed in the fictitious invoices available to fill patient

1    prescriptions.

2              ii.   Defendants SURIS and SVERDLOV, together with

3    CC-4, further agreed to use, and did use, the fictitious

4    invoices as a vehicle to return cash to SURIS and SVERDLOV.

5    Specifically, SURIS and SVERDLOV paid CC-4's drug wholesale

6    company, TriMed, for fictitious invoices.  CC-4 and others known

7    and unknown to the Grand Jury then engaged in a series of

8    financial transactions with these funds that culminated in CC-4

9    returning a portion of the fictitious invoice payments to SURIS

10   and SVERDLOV in cash.

11         f.   As a result of the false and fraudulent claims

12   submitted and caused to be submitted to Medicare by defendants

13   SURIS and SVERDLOV, together with CC-3, Medicare fund payments

14   were deposited into bank account RCP CHASE 7230 belonging to

15   Royal Care.

16         g.   Between in or around March 2012, through in or

17   around March 2015, Royal Care was paid approximately $41,515,503

18   based on claims for dispensing drugs to Medicare Part D program

19   beneficiaries.

20   //

21   //

22   //

23   //

24   //

25   //

26   //

27   //

28   //

1          COUNTS TWO THROUGH FIVE

2          [18 U.S.C. §§ 1347, 2(b)]

3          [Health Care Fraud]

4     17.   The Grand Jury incorporates by reference and

5  re-alleges paragraphs 1 through 14 above as though set forth in

6  their entirety here.

7  A.   THE FRAUDULENT SCHEME

8     18.   Beginning in or around March 2012, and continuing

9  through at least in or around March 2015, in Los Angeles County,

10  within the Central District of California, and elsewhere,

11  defendants SURIS and SVERDLOV, together with co-conspirator

12  CC-3 and others known and unknown to the Grand Jury, knowingly,

13  willfully, and with intent to defraud, executed, and attempted

14  to execute, a scheme and artifice: (a) to defraud a health care

15  benefit program, namely, Medicare, as to material matters in

16  connection with the delivery of and payment for health care

17  benefits, items, and services; and (b) to obtain money from

18  Medicare by means of materially false and fraudulent pretenses

19  and representations and the concealment of material facts in

20  connection with the delivery of and payment for health care

21  benefits, items, and services.

22  B.   MEANS TO ACCOMPLISH THE FRAUDULENT SCHEME

23     19.   The fraudulent scheme operated, in substance, as

24  described in paragraph 16 of this First Superseding Indictment,

25  which is hereby incorporated by reference as if stated in its

26  entirety here.

27  //

28  //

C.   EXECUTIONS OF THE FRAUDULENT SCHEME

20.   On or about the dates set forth below, in Los Angeles County, within the Central District of California, and elsewhere, defendants SURIS and SVERDLOV, together with co-conspirator CC-3 and others known and unknown to the Grand Jury, for the purpose of executing and attempting to execute the fraudulent scheme described above, knowingly and willfully submitted and caused to be submitted to Medicare for payment the following false and fraudulent claims seeking the following dollar amounts, which claims falsely represented that Royal Care provided the pharmaceutical items as listed to Medicare Part D program beneficiaries and that the items were medically necessary:

| COUNT | MEDICARE BENEFICIARY | CLAIM NUMBER | APPROX. DATE SUBMITTED | ITEM CLAIMED; APPROX. AMOUNT OF CLAIM |
|-------|---------------------|--------------|------------------------|----------------------------------------|
| TWO | A.L. | 150643880160 014999 | 3/05/2015 | Lidoderm; $523.68 |
| THREE | A.L. | 150643853752 021999 | 3/05/2015 | Abilify; $897.71 |
| FOUR | A.L. | 150643851741 069999 | 3/05/2015 | Seroquel; $459.52 |
| FIVE | G.N. | 150844529127 059995 | 3/25/2015 | Pennsaid; $1,408.47 |

//

//

COUNT SIX

[18 U.S.C. § 1349]

[Conspiracy to Commit Health Care Fraud]

21.   The Grand Jury incorporates by reference and re-alleges paragraphs 1 through 6 above as though set forth in their entirety here.

A.   THE CIGNA HEALTH INSURANCE PROGRAM

At all times relevant to this First Superseding Indictment:

22.   CIGNA was a private health insurance provider that operated private plans, affecting commerce, under which medical benefits, items, and services, including prescription drugs, were provided to individuals in exchange for payment.   CIGNA reimbursed medical providers ("providers") such as Royal Care that provided covered prescription drugs to patients covered by CIGNA's insurance plans ("subscribers").

23.   Providers like Royal Care were required to submit claim forms to CIGNA and/or assigned representatives of CIGNA in order to receive reimbursement from CIGNA for items they provided to subscribers.   Among other information, providers were required to state on the claim forms the patient's name and health insurance member number, the item or service that was rendered, the date that the item or service was rendered, the charge for the item or service, and the provider's name and/or the provider's identification number.   Medical providers could submit claim forms electronically.

24.   CIGNA was a health care benefit program as defined by Title 18, United States Code, Section 24(b).

//

B.   THE OBJECT OF THE CONSPIRACY

25.   Beginning no later than in or around December 2012, and continuing through at least in or around January 2015, in Los Angeles County, within the Central District of California, and elsewhere, defendant SURIS, together with co-conspirator CC-3 and others known and unknown to the Grand Jury, knowingly combined, conspired, and agreed to commit health care fraud, in violation of Title 18, United States Code, Section 1347.

C.   THE MANNER AND MEANS OF THE CONSPIRACY

26.   The object of the conspiracy was carried out, and to be carried out, in substance, as follows:

   a.   CC-3 was covered by a CIGNA health insurance plan.  CC-3 sought and obtained prescriptions for various drugs from his/her primary care physician.  On many occasions, CC-3 knew that he/she would not utilize all of the drugs that were prescribed to him/her.

   b.   CC-3 sold certain of his/her prescriptions for various drugs to defendant SURIS.  Defendant SURIS paid cash to CC-3 in exchange for these prescriptions.

   c.   Defendant SURIS, together with CC-3 and others known and unknown to the Grand Jury, knowingly and willfully submitted, and caused the submission of, false and fraudulent claims to CIGNA and/or CIGNA's representatives on behalf of Royal Care based on the false and fraudulent representation, with respect to certain of these prescriptions, that the prescriptions had been filled and the prescribed medications had been provided to CC-3.

//

1          d.     In truth and in fact, as defendant SURIS and CC-3

2    then knew, certain of these prescriptions for CC-3 had not been

3    filled, and the prescribed medications were not provided to

4    CC-3.

5          e.     To facilitate the scheme to fraudulently bill

6    CIGNA for certain prescription drugs that were never actually

7    filled or provided to CC-3, defendant SURIS and others known and

8    unknown to the Grand Jury purchased sham/fictitious TriMed

9    invoices from CC-4.   The fictitious invoices purported to list

10   various prescription drugs that Royal Care had purchased from

11   drug wholesaler TriMed, and that TriMed had provided to Royal

12   Care.   However, pursuant to an agreement between SURIS, CC-4,

13   and others known and unknown to the Grand Jury, CC-4 never

14   actually provided the prescription drugs listed on the

15   fictitious invoices, and instead provided SURIS, Royal Care, and

16   others known and unknown to the Grand Jury with only the

17   fictitious invoice documents.

18         f.     The fictitious invoices that SURIS and others

19   known and unknown to the Grand Jury purchased from CC-4 served

20   multiple purposes, including the following:

21              i.     The fictitious invoices erroneously inflated

22   the volume of prescription drug inventory, at least on paper,

23   that Royal Care ostensibly had available to fill prescription

24   drug orders.   In reality, because Royal Care never actually

25   received the drugs listed on the fictitious invoices, the

26   pharmacy did not have the quantities/types of prescription drugs

27   listed in the fictitious invoices available to fill patient

28   prescriptions.

1          ii.   Defendant SURIS, CC-4, and others known and
2    unknown to the Grand Jury further agreed to use, and did use,
3    the fictitious invoices as a vehicle to return cash to SURIS and
4    others known and unknown to the Grand Jury.  Specifically, SURIS
5    and others known and unknown to the Grand Jury paid CC-4's drug
6    wholesale company, TriMed, for fictitious invoices.  CC-4 and
7    others known and unknown to the Grand Jury then engaged in a
8    series of financial transactions with these funds that
9    culminated in CC-4 returning a portion of the fictitious invoice
10   payments to SURIS and others known and unknown to the Grand Jury
11   in cash.

12          g.   As a result of the false and fraudulent claims
13   defendant SURIS and CC-3 submitted and caused to be submitted to
14   CIGNA, CIGNA and/or its assigned representatives deposited
15   payments into bank account RCP CHASE 7230 belonging to Royal
16   Care.

17          h.   Between in or around December 2012, through in or
18   around January 2015, Royal Care was paid approximately $17,212
19   based on claims for dispensing drugs to CIGNA subscribers.

20   //
21   //
22   //
23   //
24   //
25   //
26   //
27   //
28   //

COUNTS SEVEN THROUGH TWELVE

[18 U.S.C. §§ 1347, 2(b)]

[Health Care Fraud]

27.   The Grand Jury incorporates by reference and re-alleges paragraphs 1 through 6 and 22 through 24 above as though set forth in their entirety here.

A.   THE FRAUDULENT SCHEME

28.   Beginning in or around December 2012, and continuing through at least in or around January 2015, in Los Angeles County, within the Central District of California, and elsewhere, defendant SURIS and co-conspirator CC-3, together with others known and unknown to the Grand Jury, knowingly, willfully, and with intent to defraud, executed, and attempted to execute, a scheme and artifice: (a) to defraud a health care benefit program, namely, CIGNA, as to material matters in connection with the delivery of and payment for health care benefits, items, and services; and (b) to obtain money from CIGNA by means of materially false and fraudulent pretenses and representations and the concealment of material facts in connection with the delivery of and payment for health care benefits, items, and services.

B.   MEANS TO ACCOMPLISH THE FRAUDULENT SCHEME

29.   The fraudulent scheme operated, in substance, as described in paragraph 26 of this First Superseding Indictment, which is hereby incorporated by reference as if stated in its entirety here.

//

//

14

C.   EXECUTIONS OF THE FRAUDULENT SCHEME

30.   On or about the dates set forth below, within the Central District of California, and elsewhere, defendant SURIS and co-conspirator CC-3, together with others known and unknown to the Grand Jury, for the purpose of executing and attempting to execute the fraudulent scheme described above, knowingly and willfully submitted and caused to be submitted to CIGNA for payment the following false and fraudulent claims seeking the following dollar amounts, which claims falsely represented that Royal Care provided the pharmaceutical items as listed to CIGNA subscribers:

| COUNT | CIGNA SUBSCRIBER | APPROXIMATE DATE SUBMITTED | ITEM CLAIMED; APPROX. AMOUNT OF CLAIM |
|---|---|---|---|
| SEVEN | CC-3 | 11/06/2014 | Solaraze; $1,440.14 |
| EIGHT | CC-3 | 12/01/2014 | Solaraze; $1,440.14 |
| NINE | CC-3 | 11/06/2014 | Vimovo; $988.79 |
| TEN | CC-3 | 12/01/2014 | Vimovo; $988.79 |
| ELEVEN | CC-3 | 12/01/2014 | Xolegel; $413.08 |
| TWELVE | CC-3 | 12/03/2014 | Lidoderm; $482.78 |

//
//
//
//

15

COUNT THIRTEEN

[18 U.S.C. § 1956(h)]

[Conspiracy to Commit Money Laundering]

31.   The Grand Jury incorporates by reference and re-alleges paragraphs 1 through 14, 16, 19-20, 22-24, 26, and 29-30 above as though set forth in their entirety here.

A.   THE OBJECT OF THE CONSPIRACY

32.   Beginning at least in or around March 2012, and continuing through at least in or around March 2015, in Los Angeles County, within the Central District of California, and elsewhere, defendants SURIS and SVERDLOV, together with each other, co-conspirator CC-4, and others known and unknown to the Grand Jury, conspired and agreed with one another to knowingly and intentionally commit the following offense against the United States: Knowing that property involved in financial transactions affecting interstate and foreign commerce represented the proceeds of some form of unlawful activity, and which property was, in fact, the proceeds of a specified unlawful activity, namely, conspiracy to commit health care fraud, in violation of Title 18, United States Code, Section 1349, and health care fraud, in violation of Title 18, United States Code, Section 1347, conducting, attempting to conduct, and willfully causing others to conduct and attempt to conduct financial transactions affecting interstate commerce, knowing that the transactions were designed in whole and in part to conceal and disguise the nature, location, source, ownership, and control of the proceeds of such specified unlawful activity, in violation of Title 18, United States Code, Section

1    1956(a)(1)(B)(i).

2    B.    THE MANNER AND MEANS OF THE CONSPIRACY

3         33.   The object of the conspiracy was carried out, and to

4    be carried out, in substance, as follows:

5              a.    As described in paragraphs 16 and 26 of this

6    First Superseding Indictment, which are hereby incorporated by

7    reference as if stated in their entirety here.

8              b.    Between at least in or around March 2012 through

9    at least in or around March 2015, SURIS and SVERDLOV would sign

10   and provide CC-4 and others known and unknown to the Grand Jury

11   with numerous Royal Care checks payable to TriMed in exchange

12   for fictitious invoices that TriMed had provided to Royal Care.

13   The Royal Care checks used to pay for these fictitious invoices

14   would be drawn on RCP CHASE 7230, made payable to TriMed, and

15   variously signed by SURIS and SVERDLOV.

16             c.    The Royal Care check payments to TriMed during

17   this period would specifically pay for fictitious invoices

18   (dated between March 2012 and March 2015) which indicated that

19   Royal Care had purchased prescription drugs from TriMed totaling

20   at least approximately $17,548,765.57.

21             d.    CC-4 would cause these RCP CHASE 7230 checks to

22   be deposited into bank accounts including, but not limited to,

23   TRIMED CNB 1925; CC-4 would, in furtherance of returning cash to

24   SURIS and SVERDLOV:

25                   i.    withdraw cash from TriMed bank accounts; and

26                   ii.   cause checks from TriMed bank accounts to be

27   issued to and deposited into multiple other bank accounts

28   controlled by others known and unknown to the Grand Jury and

                              17

1  held in the names of corporations that often did not in fact

2  conduct any legitimate business and did not conduct actual

3  business with CC-4 or TriMed ("the shell accounts").  A portion

4  of the funds associated with these TriMed checks would then be

5  withdrawn in cash (often in cash amounts under $10,000), from

6  either these shell accounts or from subsequent downstream shell

7  accounts, by others known and unknown to the Grand Jury, and

8  returned to CC-4.

9         e.    CC-4 would return this cash to SURIS and

10 SVERDLOV.  The amount of cash returned to SURIS and SVERDLOV by

11 CC-4 would be negotiated between SURIS, SVERDLOV, and CC-4, and

12 was often between approximately 52% and 62% of the funds that

13 SURIS and SVERDLOV originally provided to CC-4 to pay for

14 fictitious invoices.

15        f.    SURIS, SVERDLOV, CC-4, and others known and

16 unknown to the Grand Jury would effect these financial

17 transactions in order to conceal and disguise the fraud and

18 fraud proceeds associated with the pharmacy business at Royal

19 Care.

20     All in violation of Title 18, United States Code, Section

21 1956(h).

22 //

23 //

24 //

25 //

26 //

27 //

28 //

1

FORFEITURE ALLEGATION ONE

2

[18 U.S.C. §§ 981(a)(1)(C) and 982(a)(7); 28 U.S.C. § 2461(c)]

3     34.   Pursuant to Rule 32.2(a) Fed. R. Crim. P., notice is

4 hereby given to defendants ALEKSANDR SURIS and MAXIM SVERDLOV

5 (collectively, the "defendants") that the United States will

6 seek forfeiture as part of any sentence in accordance with Title

7 18, United States Code, Sections 981(a)(1)(C) and 982(a)(7), and

8 Title 28, United States Code, Section 2461(c), in the event of

9 any defendant's conviction under any of the Counts One through

10 Twelve of this First Superseding Indictment.

11     35.   Defendants shall forfeit to the United States the

12 following property:

13     a.   All right, title, and interest in any and all

14 property, real or personal, that constitutes or is derived,

15 directly or indirectly, from the gross proceeds traceable to the

16 commission of any offense set forth in any of Counts One through

17 Twelve of this First Superseding Indictment; and/or

18     b.   A sum of money equal to the total value of the

19 property described in subparagraph a.  For each of Counts One

20 through Twelve for which more than one defendant is found

21 guilty, each such defendant shall be jointly and severally

22 liable for the entire amount forfeited pursuant to that Count.

23     36.   Pursuant to Title 21, United States Code, Section

24 853(p), as incorporated by Title 28, United States Code, Section

25 2461(c), and Title 18, United States Code, Section 982(b), each

26 defendant shall forfeit substitute property, up to the total

27 value of the property described in the preceding paragraph if,

28 as a result of any act or omission of a defendant, the property

19

1  described in the preceding paragraph, or any portion thereof:

2  (a) cannot be located upon the exercise of due diligence;

3  (b) has been transferred, sold to, or deposited with a third

4  party; (c) has been placed beyond the jurisdiction of the Court;

5  (d) has been substantially diminished in value; or (e) has been

6  commingled with other property that cannot be divided without

7  difficulty.

8  //

9  //

10  //

11  //

12  //

13  //

14  //

15  //

16  //

17  //

18  //

19  //

20  //

21  //

22  //

23  //

24  //

25  //

26  //

27  //

28  //

1          FORFEITURE ALLEGATION TWO

2          [18 U.S.C. §§ 982(a)(1); 28 U.S.C. § 2461(c)]

3     37.   Pursuant to Rule 32.2(a) Fed. R. Crim. P., notice is

4     hereby given to defendants ALEKSANDR SURIS and MAXIM SVERDLOV

5     that the United States will seek forfeiture as part of any

6     sentence in accordance with Title 18, United States Code,

7     Sections 982(a)(1), in the event of any defendant's conviction

8     under Count Thirteen of this First Superseding Indictment.

9     38.   Defendants shall forfeit to the United States the

10    following property:

11          a.   All right, title, and interest in any and all

12    property, real or personal, involved in such offense, or any

13    property traceable to such property; and/or

14          b.   A sum of money equal to the total value of the

15    property described in subparagraph a.   In the event that more

16    than one defendant is found guilty of Count Thirteen, each such

17    defendant shall be jointly and severally liable for the entire

18    amount forfeited pursuant to that Count.

19    39.   Pursuant to Title 21, United States Code, Section

20    853(p), as incorporated by Title 28, United States Code, Section

21    2461(c), and Title 18, United States Code, Section 982(b), each

22    defendant shall forfeit substitute property, up to the total

23    value of the property described in the preceding paragraph if,

24    as a result of any act or omission of a defendant, the property

25    described in the preceding paragraph, or any portion thereof:

26    (a) cannot be located upon the exercise of due diligence;

27    (b) has been transferred, sold to, or deposited with a third

28    party; (c) has been placed beyond the jurisdiction of the Court;

21

1   (d) has been substantially diminished in value; or (e) has been

2   commingled with other property that cannot be divided without

3   difficulty.

4

5                               A TRUE BILL

6

7                               Foreperson

8   NICOLA T. HANNA

9   United States Attorney

10

11   LAWRENCE S. MIDDLETON
     Assistant United States Attorney

12   Chief, Criminal Division

13

14   RANEE A. KATZENSTEIN
     Assistant United States Attorney
     Chief, Major Frauds Section

15

16   SANDRA MOSER
     Acting Chief, Fraud Section

17   United States Department of Justice

18   JOSEPH S. BEEMSTERBOER
     Deputy Chief, Fraud Section

19   United States Department of Justice

20   DIIDRI ROBINSON
     Assistant Chief, Fraud Section

21   United States Department of Justice

22   ROBYN N. PULLIO
     Trial Attorney, Fraud Section

23   United States Department of Justice

24

25

26

27

28

                        22